The Honorable, the Judges of the United States Court of Appeals for the Fourth Circuit. OEA, OEA, OEA, all persons having any manner or form of business before the Honorable, the United States Court of Appeals for the Fourth Circuit, are admonished to draw nigh and give their attention, for the Court is now sitting. God save the United States and this Honorable Court. Be seated. Good morning. Welcome to the Court of Appeals. I'm Judge Diaz and Judge Quattrobono and myself, Judge Wendt. We will start with the first case today. We have four cases. The first case will be Geiger v. Zurich American Insurance Company case. And we will hear from Counsel Box, or Bax, Bax, did I pronounce it right? It's actually Box, but nobody gets that right, so I'll answer to either, sir. Well, it's because it's spelled B-A-X, not B-O-X. May it please the Court. Good morning, Your Honors. My name is Nathan Box and I'm with the foster law firm in Greenville, South Carolina. And I'm here today on behalf of the appellant, Kevin Geiger. I'm honored to appear before this Court again. Your Honors, I'm going to do my best to expound upon specific points and not just repeat what I've already stated in my brief. So first, I would like to comment briefly upon the abuse of discretion standard overview before I turn to the District Court's opinion and the own occupation definition of disability. Now, Geiger fully recognizes that the abuse of discretion standard overview is very deferential. However, I would respectfully submit that the standard is so deferential only because the burden put upon plan administrators is so great. So when you say the standard review and the abuse of discretion, usually we're talking about the District Court or a judge here. Where is your direction here? Your Honor, because I believe that the District Court, in its review, accepted a lot of the factual statements made by Zurich in its argument without doing a thorough analysis of their review, looking for the reasonableness within that decision. So your focus is not on the abuse of discretion by Zurich, but the abuse of discretion by the District Court? Well, Your Honor, I believe that the District Court misapplied the abuse of discretion and accepted factual conclusions asserted in Zurich's final denial letter without analyzing whether or not there was evidence within the record to back up those conclusions. And we don't believe that the record had the evidence and the analysis needed for Zurich to reach the denial that it did, which led to its abuse of discretion. And the District Court failed to review that adequately. Thank you, Your Honor. Now, going on with that point, Your Honor, I believe that the deferential standard... Before you go on, I thought I heard you say that you didn't think the record had sufficient evidence to support the insurance company's findings and, by implication, the District Court's affirmance of those findings. But whose burden is it to present evidence in this case? Your Honor, I believe that it is the claimant's burden to provide all the factual evidence of the case, the medical records, doctor's opinions, statements from him. I agree with you. So if that's the case and if you're saying that there wasn't enough evidence in the record, then that's on you, right? Well, I believe the evidence that's lacking here is how Zurich applied the own-occupation definition disability. Well, that's not evidence. That's sort of an application of a standard. Yes, Your Honor. But there is generally within these records vocational analysis, which I'm calling evidence, but there's opinions of qualified individuals about the own-occupation and how it's performed in the national economy. And we don't have any of that analysis here. And that's where I believe the abuse of discretion lies, Your Honor. So what we have, it seems like, is that Zurich relied on information from treating physicians that despite his heart problems and heart procedures, he was walking and doing things that would, you know, they found, the administrator found, allow you to do a sedentary job. And then they had a peer-reviewed doctor talk to the treating physicians, assess the medical records, and come to that conclusion. Yeah, I can appreciate disagreeing with that conclusion, but why is the process that uses the information from the treating physicians not evidence that would be under the standard review enough to affirm? Your Honor, I believe that the issue here is that the plan defines own-occupation as how it's defined in the national economy. Right, right. And Zurich asserts that his occupation is sedentary, but we don't have any vocational review or evidence in the record that his job, as it's performed in the national economy, is sedentary. Well, he doesn't challenge that, really. It sounds to me, I thought his objection was not that his job involved some sort of very physically active work, but the actual job he did involved unusual hours and maybe high stress. But that's different than whether it's sedentary or not. It's that in that particular application, it may have been sedentary, but it was just irregular and maybe not the sort of thing that works great for him. Yes, Your Honor. I completely agree with that because we don't, you know, we believe it probably is sedentary. I believe that the job would, you know, is what he did for CBS News is likely, we believe, very typical to what a news editor would do at any location in the country. What are you agreeing with? That. Are you agreeing that this is a question in terms of whether the job is sedentary and whether the evidence meets that? Your Honor, I'm. Because you seem to be making an argument. I'm just following up on Judge Baldwin. I'm not trying to get into it. But you seem to make an argument about the stress from the mental acuity. But where is that evidence that connects that here that you presented? To return to Judge Diaz, of course, the evidence is for you to present. Yet what you have is a doctor who says, well, your client could walk three miles a day. Yes, Your Honor. And his job is sitting down at a news, I guess, editor-type position during the day. But the evidence of the mental acuity, where is that? Your Honor, and we believe that we submitted evidence of what his job is. And like you said, it's odd hours, high-speed work, his ability to work, you know, over hours if there's a breaking news situation and stay at his desk until the next editor. All these things create a job where just generalizing it as a sedentary occupation, the broadest physical definition of that occupation misses the point of the own occupation definition of disability in the plan. But it's the risk factor that is at issue here, the risk. He has this condition, and yes, this job is this in terms of stress. But we got it in terms of the physical side of it because you got evidence from the other side, he can do all these things, and so it's sedentary. But what connects those, the heart conditions and all of that to the mental side of it? Yes, Your Honor. Other than it exists. It is a job that's mentally challenging or whatever, but there's nothing here in terms of the evidence you presented that connects that. Yes, Your Honor. I do, you know, Dr. Izzo, his treating physician in North Carolina, and I do acknowledge that I wish he had more explicitly stated this, but he repeatedly said that his clinical status is always tenuous, and that's the reason why he believes he's disabled. And we believe that that's a clear designation that we have to look beyond just what his active symptomology is when he's home and not working, and instead look at, would returning to his occupation exacerbate his medical conditions? And Dr. Cole, his cardiologist in New York, told him that if he returned to work, he would be back in for open-heart surgery within a year. And I believe that that's the clear evidence that demonstrates that, yes, he may be doing fine when he's home and not working. Yes, he can watch TV at home and read books for pleasure, but that is not the same as returning to work in a high-stressful environment, particularly for a longstanding cardiac patient, Your Honor. To follow up on that, reading the records, it seems like the disability that they talk to is the physical cardiac, his heart problems. And as I read the tenuous language, it was referring back to his recent heart procedures. And so if he had been disabled related to mental health-related issues, which certainly can happen, but I don't think he was. And I don't recall a doctor saying he was. So if he wasn't disabled for that reason, but was disabled for physical reasons, and then there's evidence that his physical reasons have improved, how do we add something that wasn't part of the reason he was disabled for? I believe, Your Honor, that yes, he is mentally sharp. We're not saying that he is cognitively unable to do any portion of his occupation. But instead, the high-paced nature of his job, all of those would exacerbate the physical conditions, which would reappear very quickly. So I believe it's the mental aspect of the job that would affect his physical conditions and prevent him from returning to that occupation and being able to form it in a continuous manner. Thank you, Your Honor. Thank you, Your Honors. Let me continue on. Is your only argument that Zurich failed to consider the mental acuity and distress of the patient? Yes, Your Honor. The district court said that high mental acuity and odd hours do not create material and substantial duties, and we believe that's a misinterpretation of the terms of the plan. The terms of the plan state that it has to be the duties that he is required to do, and that cannot be reasonably omitted from that job but for working an average of over 40 hours. Now, under that definition of material and substantial duties, working odd hours, high mental acuity, high stress do qualify as material and substantial duties. And I believe, Your Honor, without a vocational analysis of how it's performed in the national economy, I believe that those would be found to be material and substantial duties of any breaking news editor in the country. Well, I mean, stress isn't a duty. It's a consequence of the work, right? And it may be different for different people. And I guess I could go back to the concern we have about the medical evidence in this record, which you forthrightly and we appreciate conceded could have been better. I mean, the sort of statement that his condition was tenuous, I mean, what does that mean in this context? Your Honor, I believe that when Dr. Izzo made those statements, he always, you know, relayed the extensive cardiac history and the number of the five surgeries that he'd had and the number of valve replacements. So I believe that the evidence viewed objectively would demonstrate that when the doctor says tenuous, he means that his condition could worsen very easily. And particularly him saying that the reason he's disabled is because of his tenuous clinical status would mean that a return to work would cause an exacerbation of his symptoms, a decline in his condition, and that that is the reason he's unable to work. What do we make of his statement that, or at least your colleague's statement on the other side of the record, that their expert, Dr. Sims, went back to Dr. Izzo and asked him about whether he could work full time and he said he did not seem to disagree that Geiger, your client, was capable of full-time work. What does that mean? Yes, Your Honor, I don't believe that the reviewing physician stating that is very clear and reliable and probative evidence. Dr. Izzo, throughout the record, has been nothing but very supportive and has put it in writing multiple times, including some claims notes where he had his nurse return the call and make a statement. And so the reviewing physician repeating that, he may have gotten that impression, but if they wanted to make that reliable evidence, they should have sent it to Dr. Izzo for his review and signature, which is a common practice amongst these claims. Your Honors, unless there's any more questions, I'm out of time, so I appreciate your time and consideration. All right, we have a few minutes in rebuttal. We'll hear from Ms. Solares. Good morning. May it please the Court. Irma Solares on behalf of APALE, Zurich American Life Insurance Company of New York. As this Court has properly observed, the key question here is whether Zurich failed to consider the stress or mental acuity, the impact that that could have had on his position. And I submit to the Court that it did not because that was never an issue in the administrative record. That didn't come up. The record is very clear that during the 15 months that Mr. Geiger was under treatment by his physicians and receiving disability payments, both short-term disability and long-term disability, those physicians submitted on multiple occasions extensive medical notes and records to Zurich. In addition, we have three attending physician statements from Dr. Cole in New York. We have two attending physician statements from Dr. Izzo in North Carolina. And not a single one of those referenced stress or his inability to perform his job because of lack of mental acuity. In fact, there's nothing in the 746-page record that brings stress to the forefront. Well, let's think about it. We all can agree, if you look at this medical testimony and evidence here, that Mr. Geiger surely has a serious heart problem. He's had multiple procedures and all kinds of heart ailments. To what extent can we rely upon just common sense that stress is not good for someone with any heart problem but surely not with the very serious nature of his heart problems? Well, Zurich has to rest its decision on substantial evidence. The finding of disability is based on substantial evidence. And the substantial evidence here was medical records. It was the statement of job duties submitted by CBS. It was the resource questionnaire submitted by Mr. Geiger, which made no mention of stress or inability to perform any of his functions. Was Zurich required to consider Dr. Izzo's statement, this always tenuous language? What did he mean by that? And were they required to consider that as maybe pulling in this stress business? Well, it required Zurich certainly considered Dr. Izzo's statement and followed up with him and spoke with him. And as the court acknowledged, as the panel acknowledged, he thought he could return to work. And that's not inconsistent with what the record shows. In fact, Dr. Cole, a month after the surgery, believed that Mr. Geiger could return to work by February of 2019. Dr. Izzo first sees Mr. Geiger in April of 2019 and right off the bat says he can't work, even though he's just seeing him. So the statement about his tenuous condition I don't think can translate to stress. I think there has to be greater specificity in the record for that to have been an issue for Zurich to consider. I don't think it could have simply insinuated from tenuous condition that he was under a lot of stress or that returning to a stressful position, which he didn't know. Nobody knew whether it was stressful or not stressful. Let me ask you, I take it Mr. Geiger actually retired from CBS News. Correct. And in terms of insurance of long-term disability, which has been denied here, is he in a position that if something were to support that now, he still would be covered for that? In other words, is that the end of it? If he is now denied and now he's retired, he no longer will ever be eligible to get that type of disc because he's not working. Is that the case? Well, I think we have to reframe it in the sense that the terms of the policy that we're considering here is the first 24 months, which is own occupation, whether he was able to return to work to his own occupation. After the expiration of 24 months, then you look to any occupation. That would be a different analysis going forward. You're probably not going to find one more sedentary than this one where the employer said it was 89%. What about this one? Now, now, Judge. You're about to become chief, so be careful. Correct. His profession is journalism, and so I think that's a question for another day, whether what would happen under any occupation consideration. But under own occupation, it's whether, correct, sitting he's retired, what would happen now? But I ask because this chief evidence that seems to be missing is the whole business on the mental acuity and the connection to stress in the job. Correct. It seems like a doctor could go there if someone had just asked them to do it, but it wasn't done. I'm not sure they would. But my question is, if that happened, is that in a posture to change the nature of this case? I'm not trying to make a case for him to do so. I'm just saying, just interested in where this case is and what does it mean to deny it at this point and then bring it up on appeal and then get that upheld. Does it just keep going on and on? Correct. I mean, I think we have to look back to when Zurich made that determination, and it wasn't part of the record were it to go back, which we hope that would not be the case, and it were raised, that's a different issue for a different day. But on the record before the court today, it wasn't raised timely. It was raised belatedly by counsel in the litigation, but it wasn't part of the administrative record. In fact, one of the documents that was completed by Dr. Cole, a functional work assessment form, has a section for stress, and he wrote in NA, not applicable. But it asks a series of questions regarding whether stress, ability to function under stress, and that was simply not completed. So I think on this record, there is nothing, there was nothing for Zurich or the district court to conclude that stress was a factor or that he lacked mental acuity to perform his job functions. Can I go back to the point that Judge Winn was making about how this does seem to make some intuitive sense? You've got somebody who's got a history of cardiac conditions, and I think a reasonable person might conclude that any job with any level of stress might not be ideal for that person. Then on top of that, you have Dr. Izzo, who probably could have and should have said more, but at least on one or more occasions said that Mr. Geiger cannot work. And then on top of that, you have your doctor, Dr. Sims, who never really examined Geiger and nonetheless came to a conclusion that he could work, which seems to cut against the validity of his opinion, or at least perhaps question it if you haven't taken the time to actually examine somebody. So what about all of that? If you take all of that, doesn't that raise a question? I don't believe so. I think you do look to the substantial evidence that's in the record. And the least substantial thing in the record was any inference of stress or inability to perform the position because of, you know, mental issues or those issues. Yes, Dr. Izzo, all he said was cannot work. But Dr. Sims looked at Dr. Cole's medical records, Dr. Weinberg's medical records, Dr. Izzo's medical records. It looked at the form completed by Dr. Cole where he opined that he thought Mr. – granted it was a month after surgery, but he thought that Mr. Geiger could return to work. And the reality of this record is that after his surgery and after Dr. Cole completed that form, Mr. Geiger continued to improve. He went into surgery 60 pounds heavier. By April of the following year, he was 60 pounds lighter. He was doing well.  The – Dr. Sims also took into account his echocardiogram that was done in April of 2019, which came back perfect. You know, if one looks at the medical records and really analyzes, Mr. Geiger's only complaint was discomfort after long walks. We are looking strictly at the physical capabilities of doing it. And we consider the evidence that seems to be so strong here, the loss of 60 pounds, walking three miles a day, which some seems to be walking a dog, you know, maybe two or three times a week. Being a news editor at CBS with the kind of job that he has is not the same as walking a dog. When you are relaxed and you're walking through the neighborhood, your dog, your biggest problem is is he going barking or whatever. I mean, it just seems that something else ought to be considered in saying you can go back to work based upon the fact that you – and by the way, he was doing this – he really was trying to improve himself, which to some extent, a lot of it is his own statements, I'm sure. And I don't know what the message comes from this for the next case. If someone goes to a doctor, you don't tell that doctor you've been walking three miles a day if you want long-term disability. You don't tell those things. But even though he can do that, the question is why is it that Zerk wouldn't at least go into some functionality type test or something or requirement because you know, I mean, just intuitively being a news editor for CBS doesn't sound like to me it's an easy job. And I could see the stress because of the nature of news coming across. But walking a dog in your neighborhood is not the same. It's not the same, admittedly. But his job duties, Zerk did take into consideration his job duties, which were writing news copy. And it looked at the physical demands of the job. And it's 89 percent sitting, standing on occasion, lifting less than 10 pounds. It turns out if you're looking at sedimentary, maybe that's where Judge Diaz is going with our job. We sit a lot. And if that's what you mean, but when you're sitting and you're dealing with high-stress topics of news stories, of all kind of input and stuff, why is that not something you would, you know it has to be if you've got to go back to, with a heart condition and not just an ordinary heart condition. I mean, you could route off what Mr. Geiger has and some of those conditions. I didn't know one person could actually have all of them. But he has, there's no question about that. You have to at least believe there's got to be some connection. Well, I think that really is shifting the burden here. Whose burden is it to raise these issues? Is it Zerk to volunteer these things, to knock on Mr. Geiger's door and say, are you sure you're not too stressed? Are you sure you can, you know, do this? It was his burden to come forward with evidence that he was not able to perform the regular, the material and substantial duties of his position because of the added stress it would cause or because he lacked mental acuity to focus. That's not on Zerk. Any insurer shouldn't have to anticipate the claimant's arguments or presume their mental condition. I'm thinking of a job like an air traffic controller. If you had the same kind of evidence up there and no one mentioned the stress of it, but you've got a heart condition like him, your point is even then you need an expert to come in and connect and say this stress is problematic here and it affects his mental acuity because he has this heart condition. He could talk about the oxygen going through his body, that sort of stuff. You're saying that's lacking and we should hold him to what to present that. That's why I present the other question. It seems evident to me maybe I'm wrong and maybe they can't. All he has to do is go back to a doctor and really get a doctor to examine him and come back with that kind of statement. But the doctors here seem to have been focusing on the physical side only. And that's where you draw, you think we should draw the line and hold him to the burden that if he has this, don't just use common sense to do it. Make him prove it with expert testimony. Yes, I agree with that. I do think that is my position. Not just expert testimony but something in the record. Go ahead and finish your answer, I'll follow up. Pardon me. No, no, no, you finish. Zurich's obligation is to make the determination of disability based on substantial evidence. And where there's an absence of evidence.  It's the absence of fact. That was my point. Isn't it a little bit more than the absence of fact? I think Judge Wynn and Judge Diaz make very good thoughts about is there just some obvious connection of stress to someone who's suffering from heart problems. And while that may be truth, it seems there's not only the fact that the doctors don't mention stress. The functionality documentation from Dr. Cole almost suggests the alternative. Now, I don't know why he would say not applicable. I'm not a doctor. But in the record, it's not just an absence of any discussion about stress. There's in the record places where that could have been talked about and it was affirmatively marked as not applicable. That's correct. If I understand it. Is that right? That is correct. That is correct. That may be hard to kind of really understand just from us sitting here now. But that's part of the record that Zurich had to look at as I understand it. That is correct. It was a 746-page record and there's nothing from any physician or any kind of credible evidence that stress was a factor. And it wasn't Zurich's obligation to raise stress or to suggest that perhaps he might be stressed or couldn't perform his job functions because of that. Unless the panel has any further questions, Zurich will rest. Thank you very much. Thank you. Mr. Bax. Box. Thank you, Your Honor. Just a few quick points. Before you do. Yes. You heard the statement she just made? Yes. That is, there is nothing in the record that would indicate from any physician that stress was a factor. Yes, Your Honor. Did you hear that? I do. They're not explicitly using the word stress, and I agree with that. We can agree there is nothing explicitly, meaning no plain statement from a doctor or anyone indicating that stress was a factor. So to get there, how do we get there? By implication of what? Yes, Your Honor. I do think it is implicit, and it's also common sense. When asked why he couldn't return to work, this is in a claims note, when Geiger was speaking to one of the representatives. Why rely on common sense? Why not just, why didn't he just get the doctor to opine or give his opinion on that? I mean, where are we going to go with this common sense thing when we're dealing with issues of this sort? And it really becomes the question of when was it known that this is not enough? Yes, Your Honor. Unfortunately, how these cases go, the claimant doesn't know until they get the final denial. And that's sort of the unfortunate nature of how these cases go. Zurich has the final denial, the final say in it. The actual CFR has changed since this case was enacted, where the final opinion is sent to the claimant and they have a final chance to review. That was after this case occurred. So unfortunately, the plaintiff or the claimant can think that their evidence is sufficient, can see something that they believe is very obvious, and then after they receive the final denial letter find out that it's not. But, Your Honor, I would say that Geiger stated to Zurich, and I'm paraphrasing, but he said something along the lines of they asked him why couldn't you go back to work, and he said it's the odd hours and going from zero to 100 million miles an hour. That's stress, Your Honor. He didn't use the word, but I think that anybody reading that would understand that it's the fast-paced nature of his job that as a cardiac patient he simply wouldn't be able to do without risking his life and health. You're really making some good points. It's close, but the question then becomes how do we deal with this on appeal? You heard Judge Qualibon's question in terms of what this all means. And I agree, zero to 100 miles an hour, he's obviously not talking about running or doing anything physically in that position. He has to be talking about mentally or something there because CBS says his job is 89% sedentary. But, you know, these are difficult cases because we rely upon enforcing burdens here, and the burden here is to present that evidence, and when one does not present it, particularly from an expert on this, and even though we know these things to be true or it's common sense, the only reason we know it is because maybe personal experience or physical, but the medical side of it, a doctor should be able to see it. If it's that much common sense, then the doctor should be able to just verify it, and sometimes they may not like to say stuff that's common sense. But in this instance, you kind of need it, don't you? Yes, Your Honor, and I believe that the burden is on the plaintiff to provide the evidence, but the burden is also on the defendant to do a thorough analysis. And if they see that that's an obvious question, a common sense question, their peer review could have asked that or they could have had a second peer review. Every doctor that saw Geiger in person said that he was disabled. The only person disagreeing is the peer reviewer, which did not see him in person. Zurich has the ability under the terms of the plan to send him for an IME, an in-person medical exam, or send him for an FCE, a functional capacity exam. Those are rights that they have under the terms of the plan, and they failed to do so. Counsel, one thing that strikes me as we think about this case, and this certainly isn't to suggest there weren't elements of meaningful stress in the job, but I guess the argument could be lots of jobs have at times elements of stress. Almost lots of them do. And perhaps we should be, maybe the reason there's not something in there, I'm just speculating here, which probably isn't that good of an idea to do, is the argument almost would be that anyone has the cardiac conditions like your client had, that they would be permanently disabled because maybe this is on the high end of stress, maybe it's on the medium end of stress. Your job's pretty stressful, I'm sure, and people come back and do that. So perhaps the absence of evidence is not to say there's no stress or can never be connections, but that the doctors were aware that a lot of jobs have some stress, and the primary issue here is physical. Yes, Your Honor, and I believe that the court does not need to draw any bright-line rule on this. It is a question of every person's cardiac issues or whatever are going to deal with stress differently, and I think that we do have a situation here where the record raised the issue implicitly, but with the burden of analysis on Zurich, the court does not have to find that there's enough evidence in the record. It can inherently remand the case and say this is a question that was raised, we're going to send it back to the insurer with instructions to do an FCE, do an IME, address these issues, Your Honor. And so we believe that it is a question that is difficult. I do see I'm out of time, Your Honors. Any further questions? Thank you, Mr. Fox. Thank you, Ms. Solaris. We will come down and greet counsel and proceed to the next case.
judges: James Andrew Wynn, Albert Diaz, A. Marvin Quattlebaum Jr.